**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| OLIVER AND COMPANY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:25-cv-00132-MTS |
| | ) | |
| DR. RONALD ZAMBER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Dr. Ronald Zamber, Defendant Michael Cosby, Defendant Robert Grenley, Defendant Visionary Fund Manager, LLC, and Defendant Visionary Private Equity Group I, LP (together, "Defendants")'s Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. [55],[1] as well as Plaintiff Oliver and Company, Plaintiff Barbara Indra, Plaintiff Susan Delmanowski, Plaintiff Oliver Family Holdings LLC, Plaintiff J. Oliver Cunningham, Jr. Revocable Trust, Plaintiff John Oliver Teem Trust, Plaintiff Rachelle L. Indra Revocable Trust, Plaintiff Jane Warriner 1971 Trust, Plaintiff James Hart, and Plaintiff Donald Riggs (together, "Plaintiffs")'s Motion to Appoint a Receiver Pendente Lite, Doc. [47]. The Court is in receipt of the parties' respective responses in opposition and their replies in support of their motions. The Court heard argument and received testimony concerning these motions on April 28, 2025, and permitted the parties to submit supplemental briefing with respect to each. For the reasons that follow, the Court finds that it has subject matter jurisdiction over a subset of Plaintiffs' claims, and the Court will therefore grant Defendants' Motion in part and deny it in part. The

---

[1] Defendant Visionary Private Equity Group I, LP originally filed its Motion to Dismiss on April 11, 2025. Doc. [55]. Since that time, Defendants Zamber, Cosby, Grenley, and Visionary Fund Manager, LLC, have fully joined in that Motion. Doc. [82] at 11.

Court also finds that, pursuant to federal equitable principles, the circumstances in this case are sufficiently extraordinary to warrant appointing a receiver over Visionary Private Equity Group I, LP and Visionary Fund Manager, LLC.  Accordingly, the Court will appoint Mr. Jason Buhlinger of Armanino LLP, as receiver over Visionary Private Equity Group I, LP, and Visionary Fund Manager, LLC, while this action is pending, as set forth below.

## FACTUAL BACKGROUND

Visionary Private Equity Group I, LP ("VPEG" or "the Fund") is a limited partnership that operates as a private equity fund "of some 32-plus portfolio companies."  Doc. [82] at 49.  VPEG takes in limited partners, each of whom invests a certain amount of capital in exchange for a limited-partnership interest, and VPEG uses that capital to invest in the portfolio companies to provide a return on its limited partners' investments.  *Id.*  Defendant Ronald Zamber is the Chairman and Senior Managing Director of VPEG, Defendant Robert Grenley is the Director of Capital Development, Defendant Michael Cosby has served as VPEG's Senior Managing Director and General Counsel,[2] and Defendant Visionary Fund Manager, LLC, is an entity that is empowered to "manage and direct" VPEG's portfolio investments pursuant to the Limited Partnership Agreement ("LPA").  Doc. [12-4] at 6.

Plaintiffs are a series of individuals, trusts, and entities associated with the Oliver Estate, a family office that manages the assets of seven generations of Oliver family members.  Doc. [48–1] ¶ 3; Doc. [82] at 150.  Plaintiff James Hart is the President of the Oliver Family Office and oversees the general investment strategy for the Plaintiffs enumerated above.  Doc. [48–1] ¶ 3.  As limited partners of the Fund, each Plaintiff has invested significant capital in VPEG by purchasing a limited-partner interest in the entity, *see, e.g.*, Doc. [12-3] at 22 ("Subscription Agreement"), and

---

[2] Defendant Cosby has apparently resigned from these positions.  Doc. [12] ¶ 29; Doc. [82] at 90–91.

some have contributed additional funds to VPEG in the form of short-term loans, *see, e.g.*, Doc. [48-4].

VPEG brought in its first group of investors in late 2010 or early 2011.  Doc. [82] at 101.  Although these initial investors were "family and friends" of VPEG's founding partners and staff, *id.* at 114, VPEG now has "almost 1,000 limited partners," *id.* at 72, who reportedly have invested "approximately $90 million" in the Fund to date, *id.* at 190.  The LPA vests VPEG's general partner, Visionary PE GP I, LLC,[3] with the "right, power, and authority" to manage the Fund's business and affairs.  Doc. [12-4] at 6.  To attract additional limited partners, VPEG boasts a management team that "consists of highly respected professionals with a unique blend of private equity, investment banking, legal, medical, oil & gas, internet technology and operating experience that play an active role ensuring [the] portfolio have a sound operating and capital strategy."  Doc. [70-12] at 2.  VPEG also allows for possible distributions paid to its limited partners, at the general partner's discretion, pursuant to a schedule of payment contained in the LPA.  Doc. [82] at 49; Doc. [12-4] at 9, 25–26.  At least one distribution was paid out to the limited partners in 2021, *id.* at 141, but the exact amount of funds distributed, when they were distributed, and to whom is unclear.  An executive summary prepared by Defendants reported distribution payments to limited partners totaling $5.8 million as of March 01, 2024, but an updated report dated July 23, 2024, indicates that limited partners have received distributions totaling $9.1 million—a discrepancy of $3.3 million.  *Compare* Doc. [12-1] at 5, *with* [12-2] at 5.

---

[3] It does not appear that the members of this limited liability company have been formally disclosed.  Defendants have provided a list of individuals who are labeled as VPEG's general partners, *see, e.g.*, Doc. [63-1] at 1, but several of these individuals have denied knowing about Visionary PE GP I, LLC, *see, e.g.*, Doc. [82] at 132 (Brigitte Bonetti), and others have denied signing any papers that would identify them as limited-liability-company members, *see* Doc. [73-2] at 5 (Kevin DeLeon on behalf of Highgate Capital, LLC); Doc. [82] at 90 (Patrick Lepski).  Plaintiffs allege "on information and belief" that Defendants Zamber and Cosby are the sole members of Visionary PE GP I, LLC.  Doc. [12]  ¶ 42.  Testimony given at the April 28, 2025, hearing indicates that Defendants Zamber and Cosby are "making the decisions on behalf of Visionary Private Equity Group."  Doc. [82] at 90–91.

In the last several years, it appears that the financial health of VPEG has been quite dire because the Fund has been unable to pay its contractors or basic business expenses.  To illustrate, multiple independent contractors hired by the Fund have testified or submitted signed declarations asserting that they are owed many thousands of dollars in back pay, *see, e.g.*, Doc. [82] at 41 ($96,000); *id.* at 119 ($181,278); *id.* at 88 (approximately $120,000); Doc. [73-2] at 5 ($75,000); Doc. [48-8] at 4 ($220,000), some of whom have not received any payment at all for several months to a year.  Doc. [82] at 122–23.  Additionally, as of the April 28, 2025, hearing in this matter, VPEG owed over $21,000 in unpaid rent for its corporate office located in the City of St. Charles, Missouri.  *Id.* at 77.  As of the hearing, VPEG made its most recent rent payment on December 30, 2024.  *Id.*   According to a notice sent by the City of St. Charles on January 29, 2025, VPEG was operating without a valid business license and was "required to cease operation" until such time as VPEG came "into full compliance with the [City's] business license requirements" and paid "the license fee plus applicable late fees."[4]  Hearing Exhibit 4; Doc. [82] 79–80.  VPEG also received a notice from its landlord on April 10, 2025, informing it that its General Liability and Property Insurance policies had expired and that new insurance coverage was required.  *Id.* at 81–82.  Relatedly, VPEG received a Cancelation Notice from its property-insurance carrier on March 03, 2025, notifying it that VPEG's $1,055 insurance premium was past due.  Hearing Exhibit 6; Doc. [82] at 83–84.

VPEG is in arrears with several vendors as well.  For example, VPEG contracts with Dynamo Software to run its investment portal, through which the Fund's partners "can see their K-1 statements, . . . news updates, and . . . how much they're owed."  *Id.* at 84–85.  A June 26, 2024, invoice indicates that, at that time, VPEG owed Dynamo $23,000, and VPEG staff members

---

[4] A VPEG contractor cured the deficiency by paying the applicable fees out of pocket with no reimbursement.  Doc. [82] at 80.

do not know whether this invoice was ever paid. *Id.* Indeed, the investment portal has been inaccessible for periods of time because of nonpayment, most recently around April 01, 2025. *Id.* at 85. VPEG also uses a company called Inspira to manage its self-directed Individual Retirement Account ("IRA") program, which enables VPEG partners "to invest their IRA money into a self-directed IRA . . . [and allows them to] put that money towards VPEG." *Id.* at 86. An April 16, 2025, Inspira invoice shows that VPEG owes it $39,020, and of that amount, $5,700 is 90-days past due. *Id.* at 87. Again, as of the Court's April 28, 2025, hearing, VPEG staff could not say whether the invoice had been paid. *Id.* Given these difficulties and the fact that VPEG's bank account often has "little or nothing in it," Patrick Lepski, VPEG's Assistant Director of Investment Relations, testified he that does not believe that the Fund has sufficient resources to pay these current bills. *Id.* at 87–88.

Indeed, it appears that VPEG's leadership quickly uses the funds at its disposal, even if the funds are earmarked for other purposes. For example, VPEG often acts as an intermediary between current limited partners seeking to sell their shares to outside buyers and thereby exit the Fund. *Id.* 113–14. In the normal course, the buyer and seller can exchange the purchase amounts directly. *Id*. at 114. But, when the shares being sold are invested through the IRA program discussed above, the prospective buyers must send the purchase amounts to VPEG, which facilitates the transaction through Inspira so that the requisite amount can be taken out of the relevant account and sent to the seller. *Id.* In "many instances," the limited-partner seller in these transactions never received the funds from the purported sale. *Id.* Instead, Defendants collected the purchase amounts and put them to other uses instead of "cashing out" the limited-partner seller. *Id.* at 115. Some of these limited partners have yet to be paid. *Id.*

VPEG's bank records—at least to the extent they have been made a part of the record—reveal indiscriminate wire transfers of VPEG funds to Defendant Zamber, Defendant Cosby, and other individuals, entities, and accounts.  Defendants Zamber and Cosby manage VPEG's bank account at Great Southern Bank,  *id.* at 108,  and wire transfers from that account require both of their signatures.  *Id.* at 47, 113.  Brigitte Bonetti, VPEG's Managing Director and Director of Investor Relations has at-least-intermittent access to this bank account while working for the Fund.  *Id.* at 106–07 (explaining that access would be "cut off for long periods of time" starting in 2018).  According to the records that she *can* access, at least $1,779,462.63 has been wired from VPEG directly to Defendant Zamber, sometimes in varied increments mere days apart,  *see, e.g.*, Hearing Exhibit 9; Hearing Exhibit 12 at 21–22 (indicating a wire of $50,000 sent on August 13, 2021, and a wire of $175,000 sent on August 16, 2021); *see also* Doc. [82] at 106.[5]  Similarly, Defendant Cosby has received at least $128,812.50.  Doc. [82] at 109.  In addition to those amounts, Defendant Visionary Fund, LLC, of which Defendants Zamber and Cosby are the sole members, *see* Doc. [60], has received transfers of at least $705,000,  Doc. [82] at 109.  The records also show significant funds paid to entities and accounts that Ms. Bonetti does not recognize, including $422,788.55 to Visionary Private DST BIZ 1 and $895,040.06 to Visionary Private DST IND 1.  *Id.* at 112–13; Hearing Exhibit 9 at 4.

Several of VPEG's portfolio companies are struggling or defunct at this time.  Take, for example, Visionary Vaccination & Health Services, LLC, which operated as a vaccination clinic during the COVID-19 pandemic.  Doc. [82] at 43, 57.  Although the clinic has not formally closed, it stopped providing services "some two years ago" and has not earned revenue since then.  *Id.* at

---

[5] At the hearing, Defendant Zamber's counsel explained, based on statements made to him by Defendant Zamber, that these funds were wired because "Mr. Zamber made a loan to the fund, and it was repaid to him."  Doc. [82] at 199–200.

44. According to Kevin Huss, the clinic's former Director of Operations,[6] its current assets are limited to seven laptops, a medical freezer, and a medical deep freezer. *Id.* at 59. Despite these circumstances, Defendants value Visionary Vaccination & Health Services, LLC at $1.7 million. *Id.* at 59. Visionary Media Group is another example. Despite VPEG's significant investment ranging between $13 million and $15 million, Doc. [48-8] at 57; Doc. [48-1] ¶ 14, Great Southern Bank has sent multiple notices of insufficient funds showing that, over the course of the last several months, Visionary Media Group has repeatedly had negative balances in its account. Doc. [82] at 126–27; Hearing Exhibit 17.[7] In addition, at least one Visionary Media Group contractor has not received payment for services rendered dating back to 2024. Doc. [48-8] at 70 ¶ 5–6. One final example is Pop! Gourmet, a popcorn company that has not manufactured popcorn in over two years. Doc. [82] at 180. According to Plaintiff James Hart, a former Pop! Gourmet board member, Doc. [82] at 180, the company has "failed to pay its employees . . . and vendors among other bills." Doc. [48-1] ¶ 13; *see also* Doc. [82] at 183 (explaining that the national sales manager and controller each had missed seven payroll periods). At least as of April 02, 2025, Pop! Gourmet's phone number and website were inoperative due to apparent lack of payment. Doc. [48-1] ¶ 14.

Despite these circumstances, Defendants have regularly touted VPEG's financial health, the imminence of "liquidity events" for the limited partners, and increased investment values. *See, e.g.*, Doc. [48-8] at 10 ¶ 5. To create an atmosphere of urgency when recruiting additional investors, Defendants have made statements indicating that the Fund would soon close and that the one-dollar-per-share investment window would soon cease. *See, e.g.*, *id.* at 23 ¶ 8; *id* at 72 ¶ 5;

---

[6] Mr. Huss explains that he left this role because Defendants Grenley and Zamber asked him to rewrite his monthly operating reports "in a more favorable light," making them "inaccurate." Doc. [82] at 44–45.

[7] This comports with former-senior-advisor Anastasia Brown's sworn statement that she regularly raised the issue of Visionary Media Group's failure "to set or comply with a budget." Doc. [48-8] at 14.

*id.* at 90 ¶ 5.  On the contrary, the Fund remains open, and at least some new investors have been able to buy into the Fund at 1.5 shares per dollar, effectively diluting the investments of previous limited partners.  *Id.* at 24 ¶ 9.

Plaintiffs, for their part, decided to invest approximately $11 million in the Fund after hearing a presentation made by Defendants Zamber and Grenley in 2017.  Doc. [48-1] ¶ 8.  During that presentation, Defendants Zamber and Grenley explained that VPEG "invests in early stage, high growth companies that have strong management teams and the potential for significant upside" and that "VPEG's team of highly respected professionals" would "play an active role in ensuring that [the] portfolio companies have a sound operating and capital strategy."  *Id.* ¶ 6. Moreover, based on representations made by Defendant Zamber and Defendant Grenley to Plaintiffs and their representatives in 2022 and 2023—namely that liquidity events were forthcoming and that Defendants "anticipated monetizing a few of the portfolio companies within three to six months"—Plaintiffs agreed to make short term loans to VPEG totaling $1.6 million. Doc. [48-1] ¶ 9; Doc. [82] at 155, 157.  Defendant Grenley assured Plaintiffs that the amounts would be used "to invest in the Fund and for expenses."  Doc. [48-1] ¶ 9.  Plaintiff Hart loaned VPEG an additional $100,000, which Defendant Zamber promised to repay four days later because "he had vetted four new investors" who would provide VPEG additional capital.  Doc. [48-1] ¶ 10; Doc. [82] at 159.  In a meeting to discuss these loans, Defendant Zamber assured Plaintiff Hart that the short-term loans would be repaid by the end of 2024 because "he had over $50 million lined up" and that $4 million to $5 million were "guaranteed" to come into the Fund.  Doc. [82] at 166, 169–70.  None of these loans has been repaid.  Doc. [48-1] ¶ 11 (explaining that VPEG has been in default for over $2 million in loans, interest, and fees owed to Plaintiffs).[8]

---

[8] Plaintiff Hart also testified to making a $50,000 investment in Pop! Gourmet that, according to promises made by Defendant Grenley, would "be used, in part, to purchase spices and packaging" necessary to begin production of co-

In connection with those investments and loans, Plaintiff Hart requested reports from Defendants that would detail VPEG's finances.  He received a collection of documents, including a "portfolio cost basis," "balance sheet," and a "profit-and-loss statement" designated "unaudited, unreconciled, and non-tax basis."  Doc. [82] at 168; Hearing Exhibit 21.  Notwithstanding concerns regarding the accuracy of the documents, Doc. [82] at 168–69, they indicate that, by the end of 2023, VPEG possessed $218,000 in its accounts and had suffered a net loss of over $10 million.  Meanwhile, Defendants Grenley, Zamber, and Cosby "continu[ed] to make reports that there were million[s] of new investor dollars coming in or imminently coming in."  *Id.* at 169.  Plaintiff Hart met with Defendant Cosby to discuss these disclosures, but Defendant Cosby refused to answer his questions beyond generic responses, and he refused to provide audited reports.  *Id.* at 172–73 (explaining that, in addition to Defendant Cosby's refusal, Defendant Zamber refused to provide audited financial statements for at least four to five years).  Defendant Cosby provided a similar summary document dated September 30, 2024, showing that VPEG had earned a gross profit of $14.50 to that point in the year.  Doc. [82] at 176, 179.  Since that time Plaintiff Hart has persistently requested updated financial information from Defendant Grenley but has received none.  Doc. [82] at 177.

Plaintiffs bring this lawsuit asserting direct and, alternatively, derivative claims against Defendants for breach of their fiduciary duties as well as a claim against Zamber, Grenley, and Cosby for an equitable accounting because, inter alia, they have "failed to make distributions, keep or provide accurate or complete financial records, have those records properly audited, and

---

branded chips and popcorn.  Doc. [48-1] ¶ 13; Doc. [82] at 181–82.  Those funds were apparently put to other uses; neither the spices and packaging were purchased, and the food items were never produced or sold.  Doc. [82] at 183.  Indeed, in the past, funds belonging to Pop! Gourmet have been diverted to pay costs incurred by a separate, unrelated portfolio company within the Fund.  Doc. [82] at 62–63 (explaining that an invoice issued to Visionary Vaccination Clinic was at-least partially paid by a wire transfer from Pop! Gourmet).

properly account to Plaintiffs about the status of their money." Doc. [12] ¶ 144. Plaintiffs also bring a negligent misrepresentation claim against all Defendants, asserting that Plaintiffs reasonably relied on Defendants' false and misleading statements "in furtherance of investing in [VPEG] and lending it money." *Id.* ¶ 128. In addition, Plaintiffs have filed a Motion seeking the appointment of a receiver over Visionary Private Equity Group I, LP and Visionary Fund Manager, LLC, pending this litigation. Doc. [47]. Plaintiffs contend that the Court has authority to appoint a receiver over the limited partnership because the evidence placed in the record and adduced at the hearing demonstrates that Plaintiffs will suffer irreparable harm without one—that is, Plaintiffs argue there is a high likelihood that their property will be lost or diminished due to Defendants' gross mismanagement, self-dealing, and the Fund's apparent insolvency. Doc. [48] at 6; Doc. [84] at 5–6. To that end, Plaintiffs ask the Court to appoint as receiver Mr. Jason Buhlinger of Armanino, LLP. Doc. [48] at 11.

Defendants, in turn, move the Court to dismiss this action for lack of subject matter jurisdiction. Doc. [55]. In their Motion, they challenge both the jurisdictional allegations that Plaintiffs assert in their operative complaint as well as the jurisdictional facts that underpin them. Defendants argue that Visionary Private Equity Group I, LP, cannot be considered a nominal defendant in this action; rather, it must be considered a real party in interest such that the Court must consider its citizenship for purposes of this Court's diversity jurisdiction under 28 U.S.C. § 1332(a). And, once considered, complete diversity between Plaintiffs and Defendants is destroyed because, as limited partners, Plaintiffs and the Fund are citizens of the same states. Doc. [55] ¶ 5–9. Defendants also oppose the appointment of a receiver and argue that such an exceptional remedy is not warranted under the circumstances, doing so is premature and is more

appropriate after an adjudication on the merits, and that the appointment would be void for lack of subject matter jurisdiction.  Doc. [71].

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a case for lack of subject matter jurisdiction.  The movant can either challenge the complaint "on its face or on the factual truthfulness of its averments."  *Titus v. Sulivan*, 4 F.3d 590, 593 (8th Cir. 1993). With respect to a facial attack, the motion "is subject to the same standard as a motion brought under Rule 12(b)(6)."  *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir. 2003).  This means that the Court limits itself to the allegations made in the complaint, and it accepts the factual allegations as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  However, "[a] factual attack occurs 'when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction,'" and "the court considers matters outside the pleadings."  *Davis v. Anthony*, 886 F.3d 674, 679 (8th Cir. 2018) (quoting *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009)).

Where, as here, the plaintiff invokes the Court's diversity jurisdiction under 28 U.S.C. § 1332(a), the plaintiff has the burden to establish that the amount in controversy is greater than $75,000 and there is complete diversity of citizenship among the litigants.  "Complete diversity of citizenship exists where no defendant holds citizenship in the same state where any plaintiff holds citizenship."  *OnePoint Sols., LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007).  Diversity jurisdiction rests "only upon the citizenship of real parties to the controversy."  *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980).  Therefore, "[t]he presence of a nondiverse party who is nominal may be ignored in determining whether diversity jurisdiction exists."  *Slater v. Republic-Vanguard Ins. Co.*, 650 F.3d 1132, 1134 (8th Cir. 2011) (internal quotations omitted).  A nominal defendant is generally one "against whom no real relief is sought."  *Thorn v. Amalgamated Transit Union*,

305 F.3d 826, 833 (8th Cir. 2002); *see also GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 631 (7th Cir. 2013) ("[D]efendant is nominal if there is no reasonable basis for predicting that it will be held liable."); *accord* Nominal Party, *Black's Law Dictionary* (12th ed. 2024) ("[A] party who has some immaterial interest in the subject matter of a lawsuit and who will not be affected by any judgment, but who is nonetheless joined in the lawsuit to avoid procedural defects.").

The Court of Appeals for the Eighth Circuit has held that "the appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." *Morgan Stanley Smith Barney LLC v. Johnson*, 952 F.3d 978, 980 (8th Cir. 2020).

> Although there is no precise formula for determining when a receiver may be appointed, factors typically warranting appointment are a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm.

*Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316–17 (8th Cir. 1999).  The decision to appoint a receiver is within the district court's sound discretion.  *See Morgan Stanley*, 952 F.3d at 980.

## DISCUSSION

### A.    Subject Matter Jurisdiction

Defendants' arguments concerning the facial sufficiency of Plaintiffs' jurisdictional allegations are easily dispensed with.  In sum, Defendants argue that Plaintiffs' complaint does not sufficiently establish this Court's diversity jurisdiction because Plaintiffs fail to "allege the state citizenship of any party, listing only the states where each party 'resides.'"  Doc. [55] ¶ 5 (citing Doc. [12] ¶¶ 16–30).  But the Eighth Circuit has explained that the verb, "reside," sufficiently captures the "permanence" required to establish an individual's citizenship.  *See Reece v. Bank of*

*N.Y. Mellon*, 760 F.3d 771, 778 (8th Cir. 2014) (noting that "[c]itizenship requires permanence" and "[t]o reside . . . means to have one's *permanent home* in a particular place"). Accordingly, on the face of the operative complaint, Plaintiffs' jurisdictional allegations properly establish this Court's diversity jurisdiction.

Whether complete diversity in fact exists between the pertinent parties is a more difficult question. Defendants' arguments on this score are rooted in two general principles: (1) diversity jurisdiction "depends on the citizenship of the real parties to the controversy," *Jakoubek v. Fortis Benefits Ins. Co.*, 301 F. Supp. 2d 1045, 1049 (D. Neb. 2003); and (2) that a limited partnership's citizenship, for purposes of federal subject matter jurisdiction, is equivalent to that of its partners, *see Carden v. Arkoma Assocs.*, 494 U.S. 185, 195–96 (1990). Defendants argue that, because VPEG is a real party in interest and cannot be considered a "nominal defendant" as currently styled in the complaint, the Court must consider VPEG's citizenship as part of its jurisdictional analysis. Once VPEG's citizenship is properly accounted for, so the argument goes, complete diversity does not exist, and the action must be dismissed without prejudice because VPEG's citizenship is equivalent to that of Plaintiffs. Doc. [55] ¶¶ 7–9. The Court agrees, but only with respect to Plaintiffs' derivative claims.

Plaintiffs assert two categories of claims in their complaint: direct claims and derivative claims. *Compare, e.g.*, Doc. [12] ¶¶ 131–45 (direct), *with id.* ¶¶ 146–62 (derivative). Whether a claim is characterized as direct or derivative is a matter of state law. *See Popp Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 492 (8th Cir. 2004). "A derivative action is a suit by the [corporate entity] conducted by the shareholders as the corporation's representative." *Nickell v. Shanahan*, 439 S.W.3d 223, 227 (Mo. banc 2014).[9] "Derivative actions are aimed at vindicating

---

[9] Unless contested, a district court sitting in diversity applies the substantive law of the state in which it sits by default. *See BBSerCo, Inc. v. Metrix Co.*, 324 F.3d 955, 960 n.3 (8th Cir. 2003) (citing *R.E. Wood v. Mid-Valley*,

injuries to the corporation—to the shareholders collectively—and not the shareholders individually." *Id.* (citation omitted). "Shareholders cannot in their own right and for their own personal use and benefit maintain an action for the recovery of corporate funds or property improperly diverted or appropriated by the corporation's officers and directors." *Id.* By contrast, "direct, individual shareholder claims are available to redress individual wrongs." *Id.* An action is appropriately characterized as direct when it asserts violations of the shareholder's individual rights. *See Centerre Bank of Kan. City, Nat. Ass'n v. Angle*, 976 S.W.2d 608, 614 (Mo. Ct. App. 1998).

This distinction is crucial for present purposes because, in typical derivative actions, a "shareholder is only a nominal plaintiff, and the corporation is the real party in interest." *Goldstein v. Studley*, 452 S.W.2d 75, 78 (Mo. 1970). And where, as here, the "the corporation is under the control of officers who are the target of the derivative suit," such that the corporation is antagonistic to the shareholder's interest, "the corporation in [the] derivative suit should be aligned as a defendant." *Knop v. Mackall*, 645 F.3d 381, 382 (D.C. Cir. 2011) (Kavanaugh, J.) (citing *Koster v. (Am.) Lumbermens Mut. Casualty Co.*, 330 U.S. 518 (1947)).[10] Applying these principles to Plaintiffs' derivative claims, the Court concludes that it must regard VPEG as a real party in interest, and it must realign VPEG as a defendant given the antagonism that is present here. *See*

_____

*Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("[W]hen neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits.")).

[10] Contrary to Plaintiffs arguments, this antagonism rule does not operate as an "exception to the general rule that corporate entities are the real party in interest in derivative actions." Doc. [84] at 9. True, the Supreme Court in *Koster v. (American) Lumbermens Mutual Casualty Co.* observed that federal subject matter jurisdiction can be "saved" when "the corporation is in antagonistic hands," but this occurs only as a result of *realigning* the corporation from plaintiff to defendant when antagonism is present. 330 U.S. at 523 (explaining that, if the corporation in that case remained aligned as a plaintiff "Illinois corporations would then appear among plaintiffs and among defendants, and jurisdiction would be ousted"); *see also* 13E Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 3607 (3d ed.) ("[T]he test usually applied is that antagonistic parties are aligned on opposite sides.").

*Smith v. Sperling*, 341 U.S. 91, 97 (1957) (explaining that antagonism is present when corporate managers are "hostile . . . to the enforcement of the claim").  Under these circumstances, complete diversity does not exist between Plaintiffs and VPEG because their respective citizenships are coextensive.  *See Buckley v. Control Data Corp.*, 923 F.2d 96, 97–98 (8th Cir. 1991) (finding no diversity in a derivative action between limited-partner plaintiffs and the limited partnership as a defendant).

But the same is not true of Plaintiffs' direct claims, which seek to enforce their individual rights or redress individual wrongs.  *See Nickell*, 439 S.W.3d at 227.  After all, "[i]n a suit in which the stockholders are suing directly to enforce their own interests in the corporation under circumstances in which the corporation has no rights to assert as no wrong had been done to it, the corporation need not join."  7 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1615 (3d ed.).  It follows that a corporate entity named in a direct action is often one "against whom no real relief is sought," *Thorn*, 305 F.3d at 833, and one for whom "there is no reasonable basis for predicting that it will be held liable," *GE Betz*, 718 F.3d at 631.  Under those circumstances the corporate entity is properly regarded as a nominal defendant, to the extent it is named in the action at all.

The same is true here.  Plaintiffs' claim for negligent misrepresentation is undoubtedly a direct claim because Plaintiffs seek redress for damages caused by false statements made to them as a discrete group.  *See* Doc. [12] ¶ 126; *see also Nickell*, 439 S.W.3d at 227 ("A common theme in [derivative actions] is that individual actions were permitted so that individual shareholders or discrete groups of shareholders could redress injuries unique to them.");  *see also Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 134 (Mo. banc 2010) (setting forth the elements of a negligent misrepresentation claim).  Plaintiffs also assert their claim against the

individual corporate officers who made those material misrepresentations. Doc. [12] ¶¶ 125–28. Accordingly, VPEG is properly regarded as a nominal defendant with respect to this claim because Plaintiffs seek no real relief from it. Thus, its "presence . . . may be ignored in determining whether diversity jurisdiction exists." *Slater v. Republic-Vanguard Ins. Co.*, 650 F.3d 1132, 1134 (8th Cir. 2011).

Plaintiffs also assert a direct claim against Defendants for breach of fiduciary duty. Although "the fiduciary duty of a director or officer of a corporation is generally held to be between the directors and the shareholders as a whole," and a "derivative action is generally required" where "the directors or officers of a corporation have breached their fiduciary duty," *Nickell*, 439 S.W.3d at 227, "[a]ctions based upon torts where the injury is done directly to an individual shareholder or officer as such, depriving him of his rights . . . are actions which may be brought by shareholders as individuals." *Robinson v. Langenbach*, 599 S.W.3d 167, 177 (Mo. banc 2020) (citing *Pepper v. Litton*, 308 U.S. 295, 307 & n.15 (1939) ("While normally . . . fiduciary obligation is enforceable . . . through a stockholder's derivative action, . . . [i]t is also clear that breach of fiduciary duty may also give rise to direct actions by stockholders in their own right.")). Because Plaintiffs allege that Defendants' breaches of their fiduciary duties caused them individual harm, *see, e.g.*, Doc. [12] ¶¶ 95, 99, Plaintiffs' properly assert a direct claim against Defendants and, like the negligent misrepresentation claim above, VPEG's citizenship is properly disregarded because it is a nominal defendant "against whom no real relief is sought," *Thorn*, 305 F.3d at 833.

Likewise, VPEG is a nominal defendant with respect to Plaintiffs' direct claim for an equitable accounting. Plaintiffs bring this equitable claim to vindicate their own rights and recoup funds that are owed to *them* rather than the Fund. *Compare, id.* ¶¶ 138–39, 143 (seeking an accounting to ensure, inter alia, that Plaintiffs "have been paid what they are owed"), *with Dawson*

*v. Dawson*, 645 S.W.2d 120, 126 (Mo. Ct. App. 1982) (explaining that an equitable action for accounting is a derivative action "when brought in connection with a *corporation's* right to recover *corporate* funds" (emphasis added)).  Accordingly, with respect to this claim, the Court concludes that VPEG "holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute," and is appropriately considered a nominal defendant.  *S.E.C. v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998).  Indeed, its role is more akin to that of a depository or stakeholder of the funds at issue, and as such, VPEG is a nominal or formal party whose citizenship is disregarded.  *See Cramer v. Phoenix Mut. Life Ins. Co.*, 91 F.2d 141, 146 (8th Cir. 1937) ("A custodian or stakeholder of property is usually held to be a merely nominal party whose citizenship does not affect the question of federal jurisdiction.").  *See also Argo Glob. Special Situations Fund v. Wells Fargo Bank, N.A.*, 810 F. Supp. 2d. 906, 911 (D. Minn. 2011) ("[T]he issue [in determining nominal-defendant status] is whether Plaintiffs assert any claim of wrongdoing against [the depository].").  The Court will therefore grant Defendants' Motion with respect to Plaintiffs' derivative claims and deny the Motion with respect to Plaintiffs' direct claims.

## B.    Receivership

Assured of its subject matter jurisdiction over a portion of Plaintiffs' claims, the Court proceeds to the question of whether it should appoint a receiver over Visionary Private Equity Group I, LP and Visionary Fund Manager, LLC, as Plaintiffs request in their Motion and in their post-hearing supplemental brief.  Doc. [47]; Doc. [84].  In considering the matter, the Court is mindful of the broad, inherently flexible equitable powers that are at its disposal, at least when those powers are properly invoked.  *See Brown v. Plata*, 563 U.S. 493, 538 (2011) ("Once invoked, the scope of a district court's equitable powers is broad, for breadth and flexibility are inherent in equitable remedies." (cleaned up)).  These qualities have long been recognized.  *See Union Pac.*

*Ry. Co. v. Chi. R.I. & P.R. Co.*, 163 U.S. 601 (1896) ("Equity . . . has always preserved the elements of flexibility and expansiveness . . . in order to meet the requirements of every case."); *see also Seymour v. Freer*, 75 U.S. 202, 218 (1869) (explaining that "a court of equity had unquestionable authority to apply its flexible and comprehensive jurisdiction in such manner as might be necessary to the right administration of justice between the parties").  Notwithstanding the breadth of these powers, appointing a receiver remains "an extraordinary equitable remedy that is only justified in extreme situations." *Aviation Supply*, 999 F.2d at 316.

The circumstances in this case are plainly extraordinary, and they lead the Court to the firm belief that the appointment of a receiver is warranted and necessary pending this litigation.  To begin its analysis under the relevant factors outlined above, the Court finds that Plaintiffs have put forth a valid, direct claim for an equitable accounting as to the assets, obligations, and debts of VPEG to aid in the recovery of funds that they are likely owed.  *See Shaner v. Sys. Integrators, Inc.*, 63 S.W.3d 674, 677 (Mo. Ct. App. 2001) (setting forth four elements for an accounting, including the existence of a fiduciary or trust relationship, the complicated nature of the accounts, the need for discovery, and the inadequacy of legal remedies).  Of the four elements, "the existence of a fiduciary relationship is the most critical element to support the exercise of equitable jurisdiction." *Tobias v. Korman*, 141 S.W.3d 468, 474 (Mo. Ct. App. 2004).  "Neither the need for discovery nor the complicated character of the accounts will alone establish the inadequacy of the legal remedy, but instead there must be shown a fiduciary or trust relationship between the plaintiff and the defendant which will serve as a foundation for seeking equitable relief." *Am. Button Co. v. Weishaar*, 170 S.W.2d 147, 152 (Mo. Ct. App. 1943); *accord Dahlberg v. Fisse*, 40 S.W.2d 606, 609 (Mo. 1931) (explaining that equitable accounting is "particularly applicable to . . . cases where a confidential or fiduciary relationship exists").

It is undisputed that Plaintiffs, through their respective Subscription Agreements, possess limited partnership interests in the Fund.  In addition, evidence in the record demonstrates that VPEG is under Defendants' complete control.  *See, e.g.*, Doc. [82] at 90, 133–34.  Under such circumstances, Defendants occupy "the same position to the limited partners as a trustee stands to the beneficiary of a trust."  *Ebest v. Bruce*, 734 S.W.2d 915, 922 (Mo. Ct. App. 1987).  Through their limited-partnership interests, Plaintiffs enjoy the right to receive distributions that are issued by the general partner.  Although the parties agree that the Fund's limited partners have received one distribution, Plaintiffs have not been able to access any information detailing those payments.[11]

Summary reports that *have* been circulated raise more questions than they answer. Executive summaries issued mere months apart in 2024 reveal a $3.3 million discrepancy in distribution payments made to the limited partners.  *Compare* Doc. [12-1] at 5, *with* Doc. [12-2] at 5.  Indeed, it appears that at least some limited partners never received a distribution payment. Doc. [82] at 140–42.  Given VPEG's status as a fund made up of approximately $90 million in invested capital across dozens of portfolio companies, the fact that some of those companies have been overvalued and have had their assets put to outside uses, and the indiscriminate, likely covert ways in which Defendants have drawn on VPEG's account, the Court concludes the relevant accounts are sufficiently complex and that discovery will be required to: (1) disentangle VPEG's past assets, (2) accurately track the amounts paid to the limited partners during the 2021 distribution, and (3) ascertain whether Plaintiffs have received all the amounts that they were due at that time or, especially given the $3.3 million discrepancy described above, whether Plaintiffs

---

[11] More broadly, Plaintiffs have shown that Defendants have repeatedly resisted limited partners' requests for fulsome, detailed, and audited reports of VPEG's financial status, as required by the LPA, Doc. [12-4] at 8, and Missouri law, Mo. Rev. Stat. § 359.221.2(a) (enumerating a limited partner's right to information), and the promissory note that governs the loans that Plaintiffs have extended to VPEG.  Doc. [82] at  177.  To the extent Defendants have circulated information to the limited partners, the information provided is misleading—if not an outright falsification—because the financial health and the assets of the Fund's portfolio companies appear to be overstated.  *See id.* at 59–60, 180.

should have received additional funds.[12] *Cf. Dahlberg*, 40 S.W.2d at 609 (explaining that the relief given in this type of action "is an accounting and a judgment for the balance found due on taking the account"). The Court similarly finds that the inaccurate, misleading, and inflated financial information that Defendants have put forth to date demonstrates that Defendants have and very likely will frustrate Plaintiffs' claim going forward and that a receiver—as a disinterested third party—is needed to accurately review VPEG's finances.

Further, a district court's ability to appoint "at least a temporary receiver [over a corporate entity] in order to prevent threatened diversion or loss of assets through gross fraud and mismanagement of its officers" has long been established. *Burnrite Coal Briquette Co. v. Riggs*, 274 U.S. 208, 212 (1927). Although general shareholder dissatisfaction with existing management and general allegations of mismanagement are insufficient bases on which to appoint a receiver, a court in equity "has power to appoint a receiver where there is such fraud or dissension as to make it impossible for the corporation to carry on its business honestly and to the advantage of its stockholders." *Ashton v. Penfield*, 135 S.W. 938, 947 (Mo. 1911); *cf. Morgan Stanley*, 952 F.3d at 983 ("[I]n the absence of substantial federal precedent in a particular context, federal courts are quite likely to look to state law for guidance.").

Plaintiffs have put forth a trove of evidence demonstrating Defendants' gross mismanagement of VPEG, including the fact that the Fund has been unable to pay its rent, satisfy long-outstanding contractor and vendor invoices, and pay the premiums of now-lapsed insurance policies; further, under their stewardship, the Fund has defaulted on its loans, over-drafted its

---

[12] Despite applicable provisions in the LPA, Doc. [12-4] at 9, 25–27, and the arguable availability of a breach of contract claim, *see Armistead v. A.L.W. Group*, 60 S.W.3d 25, 27 (Mo. Ct. App. 2001) (discussing a breach of contract claim in the context of a partnership agreement), the Court finds that legal remedies are inadequate here. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 492, 478 (1962) (explaining that a suit for an equitable accounting can be maintained "on a cause of action cognizable at law" where plaintiff can show that the relevant accounts "are of such a complicated nature that only a court of equity can satisfactorily unravel them" (internal quotations omitted)).

accounts, and suffered losses in excess of $10 million.[13]  Plaintiffs have also introduced credible evidence indicating that Defendants Zamber and Cosby have, at times, siphoned funds from VPEG's account for their apparent personal use.  *See* Doc. [82] at 107, 109; *cf. Emergency Patient Services, Inc. v. Crisp*, 602 S.W.2d 26, 28 (Mo. Ct. App. 1980) ("[N]either the executive officers nor the directors of [a corporate entity] have a right to convert its assets to their own use.").  Accordingly, the Court finds that there is an imminent danger of further dissipation.

Plaintiffs have also credibly shown that Defendants Zamber and Grenley have made repeated material misrepresentations as to the financial health of VPEG, the likelihood of liquidity events, the amount of incoming capital contributions, and the imminent closure of the Fund, all in an effort to induce individuals to make initial investments in the fund and to garner additional funds in the form of subsequent loans.  *See, e.g.*, *id.* at 61, 157.  Such conduct generally constitutes fraud.  *See State v. Becker*, 938 S.W.2d 267, 269 (Mo. banc 1997) ("In its ordinary and usual sense, fraud includes an intent by the speaker that the hearer rely on the misrepresentation or that the purpose of the one making the misrepresentation is 'to get an advantage over another.'").  For all these reasons the Court finds that appointing a receiver is necessary, not only to halt continued mismanagement and dissipation, but to prevent Defendants from perpetrating additional fraud on current investors as well as prospective ones.  *See Macon Lumber Co. v. Bishop & Collins*, 229 F.2d 305, 307 (6th Cir. 1956) (noting that the appointment of a receiver is proper when "necessary . . . to prevent fraud"); *see also Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994) ("The appointment of a receiver is an especially appropriate remedy in cases involving fraud and the possible dissipation of assets."); *State ex rel. Hadly v. People's U.S. Bank*, 94 S.W. 953, 958 (Mo.

---

[13] Under Missouri law, such facts typically denote a party's insolvency.  *See Adams v. Richardson*, 337 S.W.2d 911, 916 (Mo. 1960) ("Insolvency means inability to pay debts as they become due in the ordinary course of business." (cleaned up)).

1906) ("[F]raud *or* mismanagement of the affairs of a corporation authorizes a court of equity to appoint a receiver for the property of the corporation." (emphasis added)).  The Court discerns no less drastic equitable remedy that will adequately achieve these aims.

Finally, the Court concludes that, for the same reasons discussed above, the appointment of a receiver "will do more good than harm." *Aviation Supply*, 999 F.2d at 317.  Defendants assert this cannot be the case because appointing a receiver over VPEG and Visionary Fund Manager, LLC, will trigger the partnership-dissolution provisions contained in the LPA.  *See* Doc. [82] at 15 ("It's a kill shot to the company.").  Based on the plain meaning of the relevant LPA provisions, the Court disagrees.

The Missouri Limited Partnership Law provides, as relevant here, that "[a] limited partnership is dissolved and its affairs shall be wound up . . . [u]pon the happening of events specified in writing in the partnership agreement."  Mo. Rev. Stat. § 359.451(2).  As set forth in the LPA: "[t]he Partnership shall be dissolved . . . [i]f within sixty (60) days after the appointment (without the General Partner's consent or acquiescence) of a trustee, receiver or liquidating trustee *of the General Partner* or of all or any substantial part of *its* property."  Doc. [12-4] at 14–15.  Importantly, the LPA designates Visionary PE GP I, LLC, "as the sole general partner."  *Id.* at 4.  When interpreting contract provisions such as these, "[i]t is a court's duty to give effect to the plain and ordinary meaning of contractual terms when possible."  *Green Street 2900 Invs. v. St. Louis Woodworks, Inc.*, 654 S.W.3d 380, 388 (Mo. Ct. App. 2022).  Here, because the Court will appoint a receiver over Visionary Private Equity Group I, LP, and Visionary Fund Manager, LLC, and it will *not* appoint a receiver over Visionary PE GP I, LLC, or the property belonging to that limited liability company, the Court concludes that the relevant dissolution provision in the LPA is not triggered.

**CONCLUSION**

The Court will dismiss without prejudice Plaintiffs' derivative claims for lack of subject matter jurisdiction, but the Court retains jurisdiction over Plaintiffs' direct claims as described above.  Pursuant to federal equitable principles, the Court will exercise its discretion and appoint Jason Buhlinger of Armanino LLP as receiver for Visionary Private Equity Group I, LP and Visionary Fund Manager, LLC, while this litigation remains pending.[14]

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. [55], is **GRANTED** in part and **DENIED** in part.  An Order of Partial Dismissal that dismisses Plaintiff's derivative claims without prejudice will be filed contemporaneously with this Memorandum and Order.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Appoint Receiver *Pendente Lite*, Doc. [47], is **GRANTED**.

**IT IS FURTHER ORDERED** that Jason Buhlinger (the "Receiver") is appointed receiver for Visionary Private Equity Group I, LP and Visionary Fund Manager, LLC along with their holdings in any portfolio companies (collectively, "the Fund") during the pendency of the above captioned action (the "Action").

**IT IS FURTHER ORDERED** that the Receiver is hereby authorized and directed to take possession and control of Property belonging to the Fund including without limitation all cash, collateral and bank accounts ("Receivership Property") wherever located; to protect the Fund from loss and waste; to take such other actions as Receiver deems reasonable and appropriate in order to take such possession and to exercise such control over the Fund in order to prevent waste and

---

[14] The Court has reviewed the information Plaintiffs provided as to Mr. Buhlinger's work and educational history, and the Court finds him sufficiently qualified to act as a receiver in this matter. Doc. [48-10].

preserve, manage, secure, and safeguard it. In addition, the Receiver is authorized to (1) gain access to Defendants' communications on e-mail accounts associated with the Fund for purposes of assessing the Fund's financial condition and (2) take over any negotiations that may be in progress regarding any pending financial transactions with the Fund.

**IT IS FURTHER ORDERED** that Receiver shall have the powers vested, conferred, enjoyed, and exercised by receivers, including, without limitation, the following:

a.  To take possession and control of Receivership Property for purposes of preserving the value thereof;

b.  To incur or pay expenses incidental to the Receiver's preservation and use of Receivership Property, and otherwise in the performance of the Receiver's duties including the power to pay obligations incurred before the Receiver's appointment if and to the extent that payment is determined by the Receiver to be prudent to preserve the value of the Receivership Property and the funds used for this purpose are not subject to any lien or right of setoff in favor of a creditor who has not consented to the payment and whose interest is not otherwise adequately protected;

c.  To do all the things that the Receiver may do in the exercise of ordinary business judgment, or in the ordinary course of the possession and control of Receivership Property including, without limitation, the purchase and sale of goods or services in the ordinary course of such business, and the incurring and payment of expenses of the business or property in the ordinary course;

d.  To obtain unsecured credit and incur unsecured debt in the ordinary course of business as an administrative expense of the Receiver without further order of this Court;

e. To intervene in any action in which a claim is asserted with respect to Receivership Property, for the purpose of monitoring, prosecuting or defending the claim;

f. To assert rights, claims, or causes of action of the Receiver arising out of transactions in which the Receiver is a participant;

g. To seek and obtain advice or instruction from the Court regarding any course of action with respect to which the Receiver is uncertain in the exercise of the Receiver's powers or the discharge of the Receiver's duties;

h. To obtain appraisals with respect to Receivership Property.

**IT IS FURTHER ORDERED** that Receiver shall not enter into any transactions that are not in the ordinary course of the Fund's business, or otherwise authorized in this Order, without Court approval and after Notice and a Hearing as may be required under applicable law.

**IT IS FURTHER ORDERED** that Receiver shall take any necessary steps to locate and secure the Receivership Property and verify the operational integrity of the Receivership Property.

**IT IS FURTHER ORDERED** that Receiver shall be responsible for the preparation and filing of any tax returns for the Fund, including, without limitation, income, personal property, commercial activity, gross receipts, sales and use, or other tax returns.

**IT IS FURTHER ORDERED** that Defendants' duties shall include, without limitation, the following:

a. Assist and cooperate fully with Receiver in the administration of the Receivership and the discharge of Receiver's duties and comply with all orders of this Court;

b. Supply to Receiver information necessary to enable Receiver to complete any schedules or reports that Receiver may be required to file with the Court, and otherwise assist Receiver in the completion of such schedules;

c. Deliver into Receiver's possession all Receivership Property and related items, documents, and information in Defendants' possession, custody, or control, including, without limitation, all:

    i. accounts, books, papers, records, and other documents;

    ii. property;

    iii. books of account;

    iv. keys;

    v. assets;

    vi. access codes;

    vii. passwords;

    viii. notices of any local, state, and federal health, building, or other violations;

    ix. list of utilities and utility accounts, equipment, furniture, vehicles, and

    x. supplies;

    xi. existing service contracts;

    xii. pending bids for contractor work;

    xiii. insurance policies for the Receivership Property;

    xiv. such other data, documents and records pertaining to the management of the Receivership Property as may be reasonably required by the Receiver; and

    xv. other personal property in their possession, custody, or control pertaining to

    xvi. the Receivership Property.

d. Submit to examination by Receiver, Plaintiffs, or any other person upon order of the Court, under oath, concerning the acts, conduct, property, liabilities, or any matter relating to Receiver's administration of the Receivership.

e.  Defendants' officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of Defendants are subject to the requirements of this section of the Order.

**IT IS FURTHER ORDERED** that Defendants and their agents, servants, employees, representatives, attorneys, officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of Defendants are hereby enjoined from:

a.  Collecting or attempting to collect proceeds from Receivership Property, and are hereby further directed to deliver to Receiver all proceeds from Receivership Property that has or may come into their possession;

b.  Interfering in any way with Receiver in the performance of Receiver's responsibilities and duties; and

c.  Using, selling, transferring, or relocating any Receivership Property unless specifically permitted by Receiver in writing.

**IT IS FURTHER ORDERED** that Receiver shall prepare a report that contains for each month from January 1, 2021, to the present a statement of cash receipts and disbursements by Defendants (including all disbursements to or for the benefit of Defendants and their affiliates). Upon further order of the Court, Receiver shall file such schedules and reports of assets, liabilities, or inventories that are necessary and proper. Whenever a list or schedule required pursuant to this Order is not prepared and filed by Defendants, Receiver shall prepare and file such list or schedule with Defendants' full cooperation.

**IT IS FURTHER ORDERED** that Receiver's monthly operating report will contain the following: (a) a statement of cash receipts and disbursements by Receiver; (b) a statement of

accrued accounts receivable of Receiver; (c) a statement of accrued rents related to the Receivership Property; and (d) a statement of accounts payable to Receiver. The operating reports shall be filed with the Court and a copy shall be provided to Plaintiffs, Defendants and all other current limited partners in Visionary Private Equity Group I, LP.

**IT IS FURTHER ORDERED** that Receiver's compensation shall be $575 per hour. In addition to such rate, Receiver shall be entitled to the reimbursement of reasonable out-of-pocket expenses. Receiver's compensation shall be paid from any proceeds from the Receivership Property. Plaintiffs shall create an escrow fund which holds $50,000.00 to the extent that proceeds from the Receivership Property are insufficient to pay Receiver's compensation.

**IT IS FURTHER ORDERED** that Receiver is authorized and empowered, without further leave of the Court, to employ any assistants, agents, managers, or other persons and entities deemed necessary and proper to assist Receiver in diligently executing the duties imposed by this Order including, but not limited to, managing, insuring, maintaining, preserving, and protecting the Receivership Property that is in the possession or under the care and control of Receiver, upon such terms and conditions as Receiver deems just and beneficial to the performance of Receiver's duties. Receiver is further authorized and empowered to employ attorneys, accountants, agents, tax-appeal consultants, and other professionals as Receiver may from time to time deem appropriate and on such terms as Receiver deems appropriate. Management Personnel and Professionals may seek monthly compensation by serving a monthly statement for payment for services rendered and reimbursement of expenses incurred during the immediately preceding month (a "Monthly Fee Statement") on: (a) Receiver, and (b) Plaintiffs. Monthly Fee Statements are not required to be filed with the Court, and the Receiver is authorized to promptly pay each Monthly Fee Statement (i) from any proceeds from the Receivership

Property, and (ii) from funds provided by Plaintiffs to the extent that proceeds from the Receivership Property are insufficient.

**IT IS FURTHER ORDERED** that Parties given notice of the Receivership or otherwise appearing and participating in the Action are bound by the actions of Receiver and the orders of this Court relating to the Receivership whether or not the person is a party to the Receivership Action.

**IT IS FURTHER ORDERED** that Defendants shall cooperate with all reasonable requests for information from Receiver for purposes of assisting Receiver in providing notice required by this Order. The failure of Defendants to cooperate with any reasonable request for information may be punished, among other ways, as a contempt of court.

**IT IS FURTHER ORDERED** that Parties and Parties in Interest have a right to Notice and a Hearing as provided in this Order whether or not the person is a Party to the Action. Any Party in Interest may appear and be heard in the Action. Notwithstanding the foregoing, whenever notice is not specifically required to be given under this Order or otherwise by court rule or applicable law, the Court may consider motions and grant or deny relief without notice or hearing, unless a party to this action or Party in Interest would be prejudiced or harmed by the relief requested.

**IT IS FURTHER ORDERED** that the following general provisions are in effect:

    a. Receiver and his employees, agents, and attorneys will have no personal liability in connection with any liabilities, obligations, liens, or amounts owed to any of Defendants' creditors because of his duties as Receiver.

    b. Receiver and his employees, agents, and attorneys will have no personal liability, and they will have no claim asserted against them relating to Receiver's duties

under this Order, except for claims due to their gross negligence, gross or willful misconduct, malicious acts, and/or the failure to comply with the Court's orders.

c.  The Receiver, the Receiver's attorneys and their agents (i) may rely on any and all outstanding court orders, judgments, decrees and rules of law, and shall not be liable to anyone for their own good-faith compliance with any such order, judgment, decree or rule of law; (ii) may rely on, and shall be protected in any action upon, any resolution, certificate, statement, opinion, report, notice, consent, or other documents believed by them to be genuine and to have been signed or presented by the proper parties; (iii) shall not be liable to anyone for their good-faith compliance with their duties and responsibilities as Receiver, or as attorneys or agents for Receiver; and (iv) shall not be liable to anyone for their acts or omissions, unless such acts or omissions were outside the scope of their duties or were grossly negligent. Except for acts or omissions that were outside the scope of the duties of Receiver, the Receiver's attorneys, or their agents, or that were grossly negligent, persons dealing with Receiver shall only look to the Receivership Property and the bond posted by the Receiver, if any, to satisfy any liability, and neither the Receiver nor his attorneys or his agents shall have any personal liability to satisfy such obligations.

**IT IS FURTHER ORDERED** that this Receivership shall continue until resignation or termination by further Order of the Court. Immediately upon termination of the Receivership, Receiver shall turn over to Plaintiffs all of the Receivership Property in which Plaintiffs assert a valid ownership or security interest or lien, unless otherwise ordered by the Court. All such other Receivership Property shall be turned over as further directed by the Court.

**IT IS FURTHER ORDERED** that Receiver shall submit a final report (with copies to counsel for all parties and Defendants or attorneys of record) to the Court within 30 days after the termination of the Receivership or Receiver's removal or resignation.

**IT IS FURTHER ORDERED** that the termination of the Receivership will discharge Receiver. Receiver may be discharged from further duties and responsibilities only after the Court, after Notice and a Hearing, approves Receiver's final report and, to the extent applicable, Receiver has turned over to a successor receiver all Receivership Property in Receiver's possession or control.

**IT IS FINALLY ORDERED** that the Court may modify this Order as it deems appropriate. Receiver, during the pendency of this action, shall have the right to apply to this Court for further instructions or directions. To the extent that modification of this Order is sought, reasonable notice to Plaintiffs, Defendants, and Receiver is required, and the moving party shall have the burden of proof.

Dated this 4th day of June 2025.

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE